## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **DALE GERALD PARROTT,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | **CIVIL ACTION NO.** |
| | ] | **5:18-cv-01294-KOB** |
| **ANDREW SAUL, Commissioner of Social Security,** | ] | |
| | ] | |
| | ] | |
| **Defendant.** | ] | |

## <u>MEMORANDUM OPINION</u>

## I.  INTRODUCTION

On June 10, 2016, the claimant, Dale Gerald Parrott, filed a Title II application for a period of disability and disability insurance benefits, alleging disability beginning June 17, 2014. The Commissioner denied the application on September 2, 2016.  The claimant then requested a hearing before an Administrative Law Judge.  On January 30, 2018, the ALJ held a video hearing.

In a decision dated February 28, 2018, the ALJ found that the claimant was not disabled as defined by the Social Security Act and was thus ineligible for social security disability benefits.  The Appeals Council rejected a subsequent request for review, so the ALJ's decision became the Commissioner's final decision.  The claimant has exhausted his administrative remedies, and the court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1631(c)(3).  For the reasons stated below, the court will affirm the Commissioner's decision.

## II. ISSUES PRESENTED

The claimant raises two issues on appeal:

1.  Whether substantial evidence supports the ALJ's decision that the claimant could

perform work in the economy when the ALJ relied on vocational expert testimony without allowing the claimant to fully cross-examine that testimony and failed to address post-hearing rebuttal evidence and objections to that testimony; and

2.  Whether substantial evidence supports the ALJ's determination of the claimant's residual functional capacity when the ALJ assigned only partial weight to a physician's opinion and did not address the claimant's work history and military service.

### III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited.  The court must find the Commissioner's decision conclusive if he applied the correct legal standards and if substantial evidence supports his factual conclusions.  *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987). "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must keep in mind that opinions, such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors, "are not medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability."  20 C.F.R. §§ 404.1527(d), 416.927(d). Whether a claimant meets a listing and is qualified for social security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210

(11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding if substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [ALJ]'s factual findings." *Walker*, 826 F.2d at 999. And the court must not only look to those parts of the record that support the ALJ's decision, but also must take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARDS

### *Disability Determination*

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." To determine whether a claimant meets the § 423(d)(1)(A) criteria, the Commissioner employs a five-step, sequential evaluation process:

(1) Is the person presently unemployed?

(2) Is the person's impairment severe?

(3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpart P, App. 1?

(4) Is the person unable to perform his or her former occupation?

(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on step three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled." 20

C.F.R. § 416.920(a)–(f).

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

*The Right to Cross-Examination*

In determining whether a claimant is disabled, the ALJ must "develop a full and fair record; *i.e.*, the record must disclose . . . a full and fair hearing." *Kelley v. Heckler*, 761 F.2d 1538, 1540 (11th Cir. 1985). The claimant's right to a full and fair hearing includes his due process rights to an "opportunity to be heard 'at a meaningful time and in a meaningful manner'" and to meaningfully cross-examine witnesses. *Martz v. Comm'r, Soc. Sec. Admin.*, 649 F. App'x 948, 962 (11th Cir. 2016) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)).

But the right to cross-examination at an ALJ hearing has a limit because "[t]he determination of whether cross-examination is warranted appears to be within the discretion of the ALJ." *Martz*, 649 F. App'x at 962 (citing *Demenech v. Sec'y of Dep't of HHS*, 913 F.2d 882, 884 (11th Cir. 1990)) (according to *Martz*, "assuming, without deciding, that [] the ALJ has the discretion to determine whether cross-examination is warranted"). And if an ALJ restricts the claimant's cross-examination of a witness, then the claimant must show that the restriction prejudiced him before the court finds "that the claimant's right to due process has been violated to such a degree that the case must be remanded." *Graham*, 129 F.3d at 1423.

*Post-Hearing Rebuttal Evidence*

After the ALJ hearing, a claimant may object to testimony given at the hearing and submit rebuttal evidence if the claimant's limitations or "unusual, unexpected, or unavoidable" circumstances prevented the claimant from submitting the evidence before the hearing. 20 C.F.R. § 404.935(b). If the claimant properly submits post-hearing evidence and the evidence is relevant to his limitations, the ALJ must consider it. *See* 20 C.F.R. § 404.1545(a)(1). But the

4

ALJ does not have to specifically address all post-hearing evidence in his decision.  *See Dyer*, 395 F.3d at 1211 ("[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision."); *Gassler v. Berryhill*, 2019 WL 945972, at *3 (S.D. Ga. Feb. 6, 2019) ("Plaintiff argues that the ALJ was obligated to inquire into her [post-hearing] objections . . . [b]ut no such duty exists in [the Eleventh Circuit].").

*Determining the Claimant's RFC*

The claimant's residual functional capacity is "the most [he] can still do despite [his] limitations."  20 C.F.R. § 404.1545(a)(1).  To determine the claimant's RFC, the ALJ must consider "all the relevant evidence in [the] case record."  *Id.*  Though the ALJ must *consider* all the relevant evidence, the ALJ does not have to "specifically *refer* to *every* piece of evidence in his decision, so long as the ALJ's decision . . . is not a broad rejection which is 'not enough to enable [the reviewing court] to conclude that [the ALJ] considered [the claimant's] medical condition as a whole.'"  *Dyer*, 395 F.3d at 1211 (emphasis added) (quoting *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995)).

When determining the claimant's RFC based on medical opinions, "the ALJ [is] required to state with particularity the weight he gave the different medical opinions and the reasons therefor."  *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987) (citing *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986)).  The ALJ cannot focus only on medical evidence that supports his decision and disregard other contrary evidence.  *McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986).  But "the ALJ may reject any medical opinion if the evidence supports a contrary finding."  *Sharfarz*, 825 F.2d at 280 (citing *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985)).

# V. FACTS

At the time of the ALJ's decision, the claimant was fifty-two years old. (R. 18). He has two master's degrees and past relevant work experience as an equipment repairer/radar specialist and a senior analyst/trainer specialist. The claimant alleges disability based on anxiety disorder, affective disorder, depression, post-traumatic stress disorder, oppositional defiant disorder, sleep apnea, osteoarthritis in the neck, knees and lumbar region, and bone spurs in his elbows and feet. The court will begin its discussion of the facts with the claimant's physical impairments and then address the claimant's mental impairments.

*Physical Impairments*

On July 27, 2009, the claimant sought treatment from Dr. Jack W. Moore for an injury to his right shoulder suffered from a four-wheeler accident. (R. 378, 381-82). Dr. Moore diagnosed the claimant with a fractured clavicle and performed surgery to repair the fracture.

On August 14, 2013, the claimant sought treatment from Dr. Robert Hash II at SportsMED Orthopedic Surgery & Spine Center for neck, back, and bilateral arm pain. Dr. Hash examined the claimant and ordered lumbar and cervical MRI's that revealed diffuse cervical spondylosis without spinal cord compression, severe compression of the C7, C6, and C5 nerve roots, and a central disc herniation at L4-5. (R. 375-80).

On August 17, 2015, the claimant's primary care physician, Dr. Geetha Scariya, informed the claimant that he had high cholesterol and high blood pressure, and advised him of the associated health risks. (R. 480). Dr. Scariya prescribed Lisonopril and Lipitor for the claimant. The claimant returned to see Dr. Scariya the following month, and Dr. Scariya noted that the claimant's cholesterol levels remained high but had improved since starting medication.

On January 29, 2016, the claimant returned to SportsMED and met with Dr. Javier Reto

to discuss his ongoing pain in the neck, arm, and lower back. (R. 389-92). The claimant reported that his pain level was 8/10 and that he had numbness and tingling in his left hand.

On February 3, 2016, Athens Limestone Hospital performed MRI's on the claimant that revealed mild to moderate disc bulging, central stenosis, bilateral foraminal stenosis in C3-7, mild to moderately severe degenerative facet changes in lumbar spine, and disc herniation. (R. 393-96).

On April 28, 2016, the claimant returned to SportsMED for a follow-up evaluation. (R. 386-88). Despite having undergone several treatments, his symptoms remained significant and severe on a regular basis. The claimant reported numbness in his arm, tingling, and paresthesia in a C6/C7 distribution. On May 2, 2016, Dr. Reto performed an anterior cervical discectomy and fusion at C5-6 and C6-7, an insertion of PEEK grafts, an anterior segmental instrumentation, and an iliac crest bone graft. (R. 399-400). The claimant entered recovery in stable condition.

On May 20, 2016, the claimant returned to SportsMED for a postoperative follow-up visit. (R. 383-85). The claimant reported that his pain had improved since surgery. His incisions appeared healthy and showed no signs of infection.

At a follow-up visit with Dr. Reto on June 17, 2016, the claimant reported pain in his neck, right shoulder, and anterior biceps with irritation. (R. 572-75). Dr. Reto noted that, although the corrective hardware was stable, the claimant's symptoms showed no signs of resolving.

On August 9, 2016, the claimant began attending physical therapy at Encore Rehabilitation, Inc. to treat his cervical disc degeneration, weakness, stiffness of joints, cervicalgia, spinal stenosis in the cervical region, and spondylosis with radiculopathy. (R. 588-89). The claimant reported numbness and tingling in his right fingers and an overall pain level of

4/10 that sometimes reached 6/10.  After an examination, the physical therapists concluded that he had only 20% ability to bend left or right at the waist, was experiencing a loss of grip in his right hand, could not reach his right hand behind his back, could not turn his head, and could not drive 100 miles or more without experiencing back pain.

The claimant also met with Dr. Ravali Tarigopula at Limestone Pulmonary and Sleep Associates on August 9, 2016.  (R. 624-26).  The claimant complained of worsening sleep apnea.  He reported waking up more than five times a night and experiencing severe daytime sleepiness.  After performing a sleep study, Dr. Tarigopula diagnosed the claimant with mild obstructive sleep apnea of unknown severity and advised the claimant to use his CPAP machine, try to lose weight, and continue taking his medication for hypertension.

On August 25, 2016, the claimant returned to Encore Rehabilitation for a follow-up assessment with Angela Hooper.  (R. 595-601).  The claimant indicated that the numbness had almost disappeared in his fingers but was still present in his fingertips.  He still struggled with his right arm mobility, ability to drive long distances, and the ability to turn his neck.  Ms. Hooper noted that the claimant had made significant progress in all areas except his right-hand grip had worsened.  The claimant's ability to bend left and right had increased from 20% to 50%.

On August 26, 2016, the claimant had a follow-up appointment with Dr. Reto.  (R. 576-79).  Dr. Reto reported that the claimant was "doing quite well," had shown "significant improvement," and that he was "generally very pleased with [the claimant's] progress."  Dr. Reto noted that the hardware in place looked stable and in appropriate position with no signs of obvious loosening or failure.  Because X-rays showed good solid fusion, Dr. Reto released the claimant to P.R.N. follow-up.

On September 8, 2016, Dr. Mary Hawke at the VA Medical Center conducted X-rays on

the claimant. (R. 653-55). The X-rays showed that the claimant had degenerative change at the great toe MTP joint and minimal degenerative change in the anterior tibiotalar joint.

On September 22, 2016, the claimant returned to Encore Rehabilitation and showed significant improvement in his pain severity, as he reported that his worst pain had decreased to a pain level of 3/10. (R. 602-11). The claimant reported that the numbness in his hands was "pretty much gone" and only "minimal now." The claimant still lacked a normal range of motion in his neck. Mrs. Hooper noted that the claimant was tighter as he performed his exercises but attributed that to the fact that the claimant worked on his truck the previous day.

On May 11, 2017, the claimant met with an occupational therapist, Victoria Harris. (R. 676-81). The claimant reported that his left arm weakness and pain from cervical radiculopathy had not changed since his surgery in May 2016. The claimant also reported numbness in his fingers. Ms. Harris advised him to attend out-patient occupational therapy to address his soft tissue, abnormal range of motion in his left shoulder, and arm weakness.

On June 12, 2017, Dr. Scariya diagnosed the claimant with osteoarthritis and advised him to use electrodes and cervical and shoulder hot/cold packs as treatment. (R. 668-71). The VA increased the claimant's disability rating from 80% to 100% based on Dr. Scariya's diagnosis.

On July 13, 2017, Dr. Kenkicht Nozaki performed a nerve conduction study on the claimant. (R. 649-52). The exam showed normal strength in his upper extremities and paresthesia in the tip of the left third digit. Dr. Nozaki concluded that claimant had chronic left cervical radiculopathy mainly at the C5 root, with ongoing denervation in the C5 myotome, and a mild bilateral median neuropathy at the wrist, as seen in carpal tunnel syndrome.

On July 26, 2017, Dr. Hawke evaluated the claimant's degenerative disc disease in the cervical spine and noted significant radicular pain that limited the claimant's activities. (R. 705-

13).  Dr. Hawke noted that the claimant had an abnormal gait because of guarding.  Dr. Hawke

reported that, based on her examination and the claimant's reported symptoms, the claimant

could only do sedentary work.

Next, Dr. Hawke evaluated the claimant's calcaneal spur in his right heel and

degenerative joint disease in the right first metatarsal phalangeal joint.  (R. 714-21).  Dr. Hawke

diagnosed the claimant with metatarsalgia in both feet and a right heel spur.  Based on her

examination, Dr. Hawke concluded that the claimant could not do work that required extensive

standing or walking.

Dr. Hawke also evaluated the claimant's thoracolumbar spine conditions.  (R. 722-33).

The claimant reported flare-ups in his spine that occurred every few days but were not present at

the time of the examination.  Dr. Hawke noted that the claimant had lumbar paraspinous

tenderness and an abnormal range of motion that would not affect the claimant's ability to

perform sedentary work.

Dr. Hawke then evaluated the claimant's strain and arthritic conditions in his shoulder

and arm.  (R. 733-41).  Dr. Hawke noted that the claimant had an abnormal range of motion in

his right shoulder and indicated that his joint tenderness was objective evidence of his reported

pain.  The claimant reported flare-ups in his shoulder and arm that occurred three times a week

but were not present at that time.  Based on her examination, Dr. Hawke concluded that the

claimant could not lift or work overhead on his right side.

Dr. Hawke then evaluated the claimant's elbow and forearm conditions.  (R. 741-50).

The claimant reported having trouble with twisting movements, but Dr. Hawke noted that his

range of motion appeared normal.  Dr. Hawke pointed to tenderness as objective evidence of the

claimant's reported sensations of pain.  The claimant reported flare-ups in his elbow and forearm

that were not present at the time of the exam. Based on her examination, Dr. Hawke concluded that the claimant's conditions would impact his ability to perform pushing or pulling movements with his elbows.

Dr. Hawke then evaluated the claimant's knee and lower leg conditions. (R. 750-58). Dr. Hawke noted that the claimant had degenerative disease in his left knee. The claimant was then taking cortisone injections every six months and reported having problems kneeling, squatting, using stairs, and lifting heavy objects. Dr. Hawke identified soft tissue in the subpatellar region as objective evidence of the claimant's reported sensations of pain. Dr. Hawke noted that the claimant's left knee had an abnormal range of motion. The claimant reported flare-ups in his legs that were not present at the time of the exam. Based on her examination, Dr. Hawke concluded that the claimant's degenerative disease in his left knee would have a functional impact on his ability to squat, kneel, and use stairs.

Next, Dr. Hawke evaluated the claimant's foot conditions. (R. 758-65). The claimant reported plantar pain in both feet stemming from his flat foot and degenerative arthritis. Dr. Hawke found that the claimant had callouses on his foot, a symptom of flat foot, but did not observe any swelling. Based on these conditions, Dr. Hawke concluded that the claimant could not stand on concrete for a prolonged period of time.

The claimant also reported having external hemorrhoids which caused rectal itching and mild to moderate bleeding. (R. 766-68). But no symptoms appeared at the time of Dr. Hawke's examination so she could not evaluate those conditions.

*Mental Impairments*

On May 27, 2015, the claimant visited with Dr. James Waller for sleep, anxiety, and concentration problems. (R. 502-07). After examining the claimant, Dr. Waller wrote some

brief notes on the claimant's symptoms and referred him to Dr. Lindsay Levine at the physician's clinic.

On June 12, 2015, the claimant reported to Dr. Levine's office at the physician's clinic and met with Dr. Nathaniel Kouns. (R. 492-97). The claimant reported depressive symptoms of anhedonia, low energy, and avolition, but he denied symptoms at present. He claimed his depressive symptoms had worsened over the last six months. He also reported that, after losing his job as a government contractor, he felt increasingly frustrated, isolated, and more depressed. Dr. Kouns diagnosed the claimant with major depressive episodes and prescribed him Welbutrin and titrate. The claimant's screening for depression came back positive and his screening for PTSD came back negative. Dr. Levine reviewed the claimant's file and concurred with Dr. Kouns's assessment of the claimant's mental health.

On August 7, 2015, the claimant had a telehealth consultation with Dr. John Hammond. (R. 487-92). Dr. Hammond noted that the claimant appeared frustrated even though he claimed he was "doing okay." The claimant said his ability to concentrate had improved since he began taking Welbutrin. The claimant said that he was on the "edge of anxiety at times" and wished to decrease the dosage of his medication. Dr. Hammond spent 16 minutes of the 20-minute visit conducting psychotherapy with the claimant. Dr. Hammond reduced the claimant's dosage of Welbutrin in an attempt to alleviate the claimant's feelings of anxiety. Dr. Levine reviewed Dr. Hammond's notes and concurred with his assessment and treatment plan.

On October 16, 2015, the claimant had a telehealth consultation with Dr. Levine. (R. 468-74). The claimant reported that he was feeling "okay" and that his mood was "okay." He said that he was doing "pretty good" and "as long as he stays busy he is good." The claimant reported that the Welbutrin had improved his ability to concentrate but indicated that he still had

feelings of being "on the edge of anxiety." Dr. Levine spent 20 minutes with the claimant, of which 16 minutes was psychotherapy.

On April 15, 2016, the claimant visited Dr. Hammond at his clinic. (R. 456-64). The claimant reported that he was then building a chicken coop but had problems with focusing on the task at hand. He said that he could not feel excited about anything and had a general lack of motivation. He claimed that he was having memory problems; he could not even recognize the clinic from his last visit. The claimant reported having nightmares and said he wanted something to help him sleep. He claimed that he had previously seen a doctor for PTSD that he suffered from combat during his military deployment in Iraq. He said he was plagued with "impending thoughts of doom" and reported hyper-vigilant behavior. He did not like being in big crowds or at malls. And he claimed that he lost his job because he could not work well with others and maintain relationships. Dr. Hammond instructed the claimant to continue taking Prozasin, Welbutrin, and Mirtazopan and to continue with his therapy.

On June 10, 2016, the claimant had a telehealth consultation with Dr. Hammond. (R. 534-41). The claimant reported that he was sleeping well and his nightmares had decreased. He said his mood was "okay, well better." Dr. Hammond noted that the claimant had a calm and eurythmic affect. The claimant was regularly attending Alcoholics Anonymous meetings and seeing a therapist. He mentioned that he had upcoming plans to go to Six Flags with his daughter even though he still exhibited hyper-vigilant behavior in large crowds.

On June 23, 2016, the claimant visited with his therapist, Dr. Steiner. (R. 527). The claimant discussed his relationship problems and his uneasy feelings in large crowds and unfamiliar places. The claimant reported feeling "isolated" and "defeated," and said he no longer did the things that he had previously enjoyed like riding motorcycles, going to festivals and

restaurants, and dating.  Dr. Steiner diagnosed the claimant with an unspecified anxiety disorder.

*The ALJ Hearing*

At the video hearing before the ALJ on January 30, 2018, the claimant testified that he worked for a company called Intuitive Research and Development from 2010 until the time of his alleged disability onset in 2014.  The claimant indicated that, around 2014, he was diagnosed with PTSD that he suffered from combat.  The claimant also testified that, since the onset of his disability, his psychological symptoms had remained about the same severity.  (R. 165).

The ALJ asked the claimant about his physical impairments.  (R. 165-72).  The claimant testified that he had several spinal issues that led to a cervical fusion in May 2016.  He testified that, although he did have a brief period of improvement after the surgery, his previous symptoms had returned and he was "the same as before [he] ever had surgery."  The claimant testified that he could not hold up his neck, that he felt numbness in his hands, and that he struggled to hold things with his left hand.

When asked about the lumbar area of his back, the claimant testified that he had a lot of pain in his lower back and sciatic nerve pain when standing.  He claimed that he had constant pain at a 6/10 and pain on his worse days at an 8/10.  The claimant said that sometimes the pain was so sharp and quick that he saw flashes of light.

The claimant also testified that any physical activity increased his pain.  He testified that his back pain entirely precluded him from running; made brisk walking painful with "little spikes of pain"; required him to use a cane to help him get around; precluded him from bending forward at the waist without experiencing spikes of pain at the 8/10 level; made getting up from kneeling difficult; required him to lean against something if he stood for more than ten minutes; required him to stand after sitting for ten to fifteen minutes; and forced him to stop frequently when

driving long distances.  (R. 169-72).

The claimant testified that he had carpal tunnel syndrome that caused pain in both hands. (R. 172).  He claimed that he could not do any kind of repetitive work with his hands.  He claimed that this limitation precluded him from "hardly doing anything anymore," specifically the activities he used to enjoy such as riding motorcycles or exercising.

The claimant also testified about his mental health issues.  (R. 172-75).  The claimant said that he was anxious and depressed most of the time and had problems concentrating and remembering important meetings and appointments.  He explained that these mental impairments contributed to him losing his job as a senior analyst.  He said that he no longer had any hobbies and generally refrains from doing most of the things he used to enjoy, such as hiking, fishing, and riding motorcycles.  The claimant testified that he leaves his house three days a week, generally for AA meetings and some quick shopping if necessary.  He testified that he has remained sober since 2006 without relapse.

When asked whether he would like to add anything to the record, the claimant expressed his disgust for not being able to support himself.  (R. 175).  He claimed that, in the Army, he had always taken pride in taking the hard jobs.  He added that his feet caused him problems and that he had plantar fasciitis in both feet that caused pain when standing.

After the claimant's testimony, the ALJ called upon the vocational expert, Dr. Jewel Euto, to answer questions about the type and quantity of jobs available to a hypothetical person with the claimant's limitations.  (R. 176-79).  The VE testified that someone with limitations similar to the claimant's limitations would be able to work as a blending-tank tender helper, a packer inspector, and a bench assembler.  The VE also testified that such an individual would not be able to maintain those types of employment if he would miss one or two days of work per

month because unskilled jobs could normally tolerate only one day of absence per month. The VE also testified that the employee could not do any work if he was off task for 15% of an eight-hour workday or could only work six hours of an eight-hour workday.

During his cross-examination of the VE, the claimant's representative asked what type of methodology the VE used to determine which jobs were available for specific individuals. The VE responded that she used "a combination of Job Browser Pro as well as determining full-time versus part-time work . . . and a breakdown of that plus the number of items that is encompassed in the census number, the number of positions that are involved in the census numbers in the . . . breakdown." (R. 180). And the VE confirmed that she started with "SOC codes or census numbers." (*Id.*).

The claimant's representative asked the VE, "can you tell me the methodology generally that's used to translate [SOC codes or census numbers] into DOT codes?" (R. 180). The ALJ interjected before the VE could answer and told the claimant's representative that the parties accepted the VE's methodology before the hearing and that the VE's methodology was "widely recognized" as "acceptable practice." (*Id.*). The claimant's representative expressed concern that pre-hearing resolutions would not be in the record and stated that he had a right to know about the VE's methodology. Over multiple objections, the ALJ maintained his position and prevented the claimant's representative from pursuing this line of questioning. (R. 181).

*The Claimant's Post-Hearing Objections and Rebuttal Evidence*

After the hearing, on February 6, 2018, the claimant submitted a "Post-Hearing Memorandum of Law & Objections to the Vocational Witness's Testimony." (R. 32). In the brief, the claimant asserted that substantial evidence did not support the VE's testimony that the claimant could perform the jobs of blending-tank tender helper, packer inspector, and bench

assembler because data sources that the VE did not identify and a vocational rehabilitation counselor, Dr. Thomas O'Brien, indicated that those jobs required physical capabilities beyond the claimant's RFC. (R. 32-38). The claimant attached several exhibits to his brief that purportedly supported his arguments and rebutted the VE's testimony. (R. 39-109). The court addresses the post-hearing materials in more detail below when analyzing the claimant's first asserted basis for reversal.

*The ALJ's Decision*

In a decision dated February 28, 2018, the ALJ found that the claimant was not disabled as defined by the Social Security Act.

In his decision, the ALJ first stated that he declined to admit the claimant's post-hearing brief and rebuttal evidence because the claimant did not submit those materials no later than five days *before* the hearing as required by 20 C.F.R. § 404.935(a) and the materials did not meet any of the § 404.935(b) exceptions to the five-day rule. (R. 10); *see* 20 C.F.R. § 404.935(b) (providing that the ALJ will accept evidence filed after the § 404.935(a) deadline if the SSA misled the claimant or if the claimant's limitations or "unusual, unexpected, or unavoidable" circumstances prevented the claimant from submitting the evidence earlier). Even so, later in his decision, the ALJ considered Dr. O'Brien's opinion that the claimant submitted with his post-hearing rebuttal evidence. (R. 17). But the ALJ assigned little weight to Dr. O'Brien's opinion that the claimant would require more absences than unskilled positions could tolerate because Dr. O'Brien was not a treating provider or a vocational expert recognized by the agency "according to the lack of designation on the curriculum vitae." (*Id.*).

Then, at step one of the five-step sequential evaluation process, the ALJ found that the claimant met the insured status requirements of the Social Security Act through December 31,

2019 and had not engaged in substantial gainful activity since his alleged onset date of June 17, 2014. (R. 13).

At step two, the ALJ found that the claimant had the severe impairments of degenerative disc disease of the lumbar and cervical spine, carpal tunnel syndrome, anxiety disorder, and major depressive disorder. (R. 13-14).

At step three, the ALJ found that the claimant did not have an impairment, or a combination of impairments, that met or medically equaled the severity of one listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 13-14). The ALJ determined that the claimant's degenerative disease did not meet the criteria for Listing 1.04 because the claimant had none of the disorders identified in that Listing.

Then the ALJ considered whether the claimant's mental impairments met the criteria for Listing 12.04 or 12.06 and found that the claimant's impairments did not satisfy the Paragraph B criteria because the claimant did not exhibit one extreme or two marked limitations in the four broad areas of functioning. Specifically, the ALJ found that the claimant had only a mild limitation in understanding, remembering, or applying information because the claimant indicated that he was able to drive and go out alone; the claimant had a moderate limitation in interacting with others because, even though he lost jobs due to his inability to get along with others, he regularly attended AA meetings and spent time online and with social media; the claimant had a moderate limitation with concentrating, persisting, or maintaining pace as indicated by his ability to read and spend time online, even though he reported a loss in cognitive thinking and did not follow instructions well; and the claimant had a mild limitation in adapting and managing himself, as shown by his ability to take care of his dog and himself and his ability to get out alone and drive a car.

Next, the ALJ considered whether the claimant satisfied the Paragraph C criteria. The ALJ decided that the evidence did not satisfy the Paragraph C criteria because the record did not show a medically documented history of the existence of a disorder over a period of two years, and evidence existed of ongoing medical treatment, mental health therapy, psychosocial support, or a highly structured setting that diminished the symptoms of the claimant's mental disorder.

Before proceeding to step four, the ALJ determined that the claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) with the following limitations: he could not climb ladders, ropes or scaffolds; he could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; he could not reach overhead with the bilateral extremities; he could occasionally handle with the non-dominant left upper extremity; he could frequently handle with the right dominant upper extremity; he should avoid concentrated exposure to temperature extremes, vibrations, unprotected heights, and moving machinery; he could understand, remember, and carry out simple tasks with customary breaks throughout the workday; he could interact with the public, coworkers, and supervisors occasionally; and he could adapt to occasional changes in the workplace. (R. 15).

Then the ALJ addressed the medical opinion evidence on the record. Dr. Samuel Williams reviewed the claimant's medical records as of September 2, 2016 and opined that the claimant could understand and follow simple instructions, but would struggle with difficult or complex instructions; could maintain concentration and focus to carry out simple tasks during an eight-hour workday; would benefit from a flexible daily work schedule and would be expected to miss one or two days of work per month because of psychiatric symptoms; could tolerate ordinary work pressure, but should avoid excessive workloads, quick decision-making, rapid changes, and multiple demands; would benefit from regular rest breaks and a slowed pace, but

would be able to perform with the mental demands of a competitive level of work; could engage in casual and non-intensive contact with co-workers and supervisors; could handle supportive and non-confrontational feedback and criticism; and would work best with a small group of familiar co-workers. (R. 16-17, 194-96).

The ALJ gave Dr. Williams's opinion only partial weight. The ALJ accepted all of Dr. Williams's opinion except his opinion that the claimant would likely miss one or two days of work per month because of psychiatric signs and symptoms. The ALJ found that the record did not support absences because the claimant reported that he "does well when he keeps busy" and psychological records showed that the claimant was generally stable on medication. (R. 17).

Based on the claimant's RFC, at step four, the ALJ accepted the VE's opinion that the claimant could not perform any past relevant work. (R. 18). Then, at step five, after considering the VE's testimony and the claimant's age, education, work experience, and RFC, the ALJ found that jobs existed in significant numbers in the national economy that the claimant could perform. (R. 18-19). Those jobs were blending tank/tender helper, packer/inspector, and bench assembler. So the ALJ finally decided that the claimant was not disabled.

## VI. DISCUSSION

**A.** **Whether Substantial Evidence Supports the ALJ's Step-Five Decision that the Claimant Could Perform Jobs that Exist in Significant Numbers in the National Economy**

At step five of the sequential evaluation process, the ALJ found that the claimant could perform jobs that exist in significant numbers in the national economy based on the VE's testimony that a person with the claimant's age, education, work experience, and RFC could perform the jobs of blending tank/tender helper, packer/inspector, and bench assembler. The claimant contends that substantial evidence does not support the ALJ's finding because the ALJ

(1) limited the claimant's cross-examination of the VE at the hearing; and (2) did not address the claimant's post-hearing rebuttal evidence and objections to the VE's testimony. The court addresses each of the claimant's contentions in turn.

### 1. Cross-Examination of the VE

On cross-examination at the ALJ hearing, the VE testified that he relied on SOC codes, census numbers, and Job Browser Pro data in answering which jobs a person of the claimant's RFC could perform and the quantity of those jobs in the national economy. The claimant's representative asked the VE about the methodology he used in translating that data into DOT job codes, but the ALJ would not allow the claimant's representative to pursue this line of questioning because, according to the ALJ, the parties had resolved before the hearing that the VE used methodology widely recognized as acceptable. (R. 179-81). The claimant's representative disagreed and objected to the restriction on cross-examination because, according to him, he had a right to know the methodology that the VE used. The claimant now asserts that the restriction on cross-examination constitutes reversible error. The court disagrees.

As stated above, an ALJ commits reversible error by restricting cross-examination only if the restriction deprives the claimant of a full and fair hearing and causes the claimant prejudice. *See Graham*, 129 F.3d at 1423; *Kelley*, 761 F.2d at 1540. But, in this case, limiting cross-examination of the VE did not cause the claimant prejudice. The VE testified about his data sources, endorsed the Job Browser Pro numbers upon which he based his testimony, and relied on his experience and expertise in forming his opinions. The ALJ then reasonably credited the VE's testimony. The claimant has not shown how pulling back the curtain on the VE's methodology any more would have rendered the VE's testimony unreliable. Instead, the claimant only speculates that he would have found prejudicial flaws with the VE's testimony if

cross-examination continued.  But a claimant cannot show prejudice with "pure speculation" that he "might have benefited from a more extensive hearing." *Kelley*, 761 F.2d at 1540.  So the ALJ did not commit reversible error by limiting cross-examination of the VE at the hearing.

### 2.  *Post-Hearing Objections and Rebuttal Evidence*

In his post-hearing brief, the claimant asserted that the VE relied on outdated job data in testifying as to what jobs the claimant could perform because O*NET, a database of job descriptions sponsored by the DOL, indicated that jobs the VE identified are semi-skilled to skilled jobs and thus unavailable to the claimant.  (R. 35-36).  The claimant also asserted that the VE's testimony was unreliable because the DOL Selected Characteristics of Occupations manual and Dr. O'Brien's opinion indicated that the jobs the VE identified required physical capabilities beyond the claimant's RFC.  (R. 36-37).  The claimant contends that the ALJ committed reversible error by not addressing the post-hearing rebuttal evidence in his final decision.  The court disagrees.

None of the rebuttal evidence that the claimant submitted with his post-hearing brief undermines the substantial evidence that supports the VE's testimony and, consequently, the ALJ's decision.  Again, the VE relied on Job Browser Pro, census data, SOC codes, the DOT, and his expertise and experience in opining which jobs the claimant could perform.  In doing so, he provided adequate testimony on which the ALJ could rely.  The social security regulations explicitly allow the ALJ to rely on the DOT, census data, and the VE's expertise when determining the claimant's RFC.  *See* 20 C.F.R. §§ 404.1560(b)(2), 404.1566(d).  The VE was "not require[d to] to produce detailed reports or statistics in support of her testimony."  *Bryant v. Comm'r of Soc. Sec.*, 451 F. App'x 838, 839 (11th Cir. 2012).  And the information on which the VE relied "puts [the] VE's evidence in line of what other courts have deemed acceptable

testimony." *Pickett v. Berryhill*, 2019 WL 968901, at *6 (N.D. Ala. Feb. 28, 2019) (citing *Bryant v. Comm'r of Soc. Sec.*, 451 F. App'x 838, 839 (11th Cir. 2012), and *Hancock v. Comm'r of Soc. Sec.*, 2016 WL 4927642, at *4 (M.D. Fla. Sept. 16, 2016)); *see Bryant*, 451 F. App'x at 839 ("The VE testified that she based her reductions on census figures, state information, labor market surveys, and job analyses. . . . Thus, the record reflects that the VE had a reasoned basis for the figures at which she arrived."). Accordingly, substantial evidence supports the ALJ's step-five determination that the claimant could perform work in the economy based on the VE's testimony.

Next, the claimant contends that the ALJ committed reversible error by failing to address the claimant's post-hearing objections because the SSA Hearings, Appeals and Litigation Manual ("HALLEX") states that "the ALJ *must* . . . rule on any objection(s) [to the VE's testimony] on the record during the hearing, in narrative form as a separate exhibit, or in the body of his or her decision." HALLEX § I-2-6-74(B) (emphasis added). Again, the court disagrees.

HALLEX is not binding law. *See McCabe v. Comm'r of Soc. Sec.*, 661 F. App'x 596, 599 (11th Cir. 2016) ("This Court has not decided whether HALLEX carries the force of law."); *George v. Astrue*, 338 F. App'x 803, 805 (11th Cir. 2009) (calling the assumption that HALLEX carries the force of law "a very big assumption"); *Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000) ("HALLEX does not carry the authority of law."); *Brownlow v. Colvin*, 2016 WL 814953, at *5 n.7 (S.D. Ala. Feb. 29, 2016) ("HALLEX is an SSA internal manual that 'does not carry the authority of law.'") (quoting *Newton*, 209 F.3d at 459). Thus, the court will not treat a HALLEX violation—if one occurred in this case—as grounds for reversal as a matter of law.

And, assuming the ALJ ignored HALLEX directives, "the Eleventh Circuit has held that

'an agency's violation of its own governing rules must result in prejudice before [the court] will remand to the agency for compliance.'" *Pickett*, 2019 WL 968901, at *5 (quoting *Carroll v. Comm'r of Soc. Sec.*, 453 F. App'x 889, 892–93 (11th Cir. 2011)).  But, as explained above, no prejudice resulted from the ALJ's failure to specifically address the claimant's post-hearing objections and rebuttal evidence.  So no basis exists to remand this case based on HALLEX.

Having rejected both of the claimant's arguments for why substantial evidence does not support the ALJ's step-five determination that the claimant could perform work in the economy, the court will affirm the ALJ's step-five determination.

## B.     Whether Substantial Evidence Supports the ALJ's Determination of the Claimant's RFC

The ALJ found that the claimant had the RFC to perform light work with several physical and mental limitations.  (R. 16).  The claimant argues that substantial evidence does not support the ALJ's RFC determination because the ALJ (1) assigned only partial weight to Dr. Williams's opinion; and (2) did not address the claimant's work history or military service.  The court addresses each of the claimant's contentions in turn.

### 1.     *Assigning Partial Weight to Dr. Williams's Opinion*

Based on his review of the claimant's medical records up to September 2, 2016, Dr. Williams opined that, among other limitations, the claimant would miss one or two days of work per month because of psychiatric signs and symptoms.  (R. 16-17).  The ALJ assigned partial weight to Dr. Williams's opinion; *i.e.*, the ALJ accepted all of Dr. Williams's opinion *except* for his opinion that the claimant would miss one or two days of work per month.  According to the ALJ, the record did not support that the claimant would be absent on a consistent basis because the claimant reported that he "does well when he keeps busy" and psychological records showed that the claimant was generally stable on medication.  (R. 17).  The claimant asserts that the

ALJ's assignment of partial weight to Dr. Williams's opinion and the ALJ's explanation for doing so constitutes reversible error. The court disagrees.

As stated above, when determining the claimant's RFC based on medical opinions, "the ALJ [is] required to state with particularity the weight he gave the different medical opinions and the reasons therefor." *Sharfarz*, 825 F.2d at 279 (citing *MacGregor*, 786 F.2d at 1053). And the social security regulations provide that the weight given to a doctor's opinion depends in part on whether the doctor examined the claimant, whether the doctor provided supporting explanations for his opinion, and whether the doctor based his opinions on the claimant's subjective statements. *See* 20 C.F.R § 404.1527(c).

Here, the limited nature of Dr. Williams's opinion supports the partial weight given to his opinion. Dr. Williams reviewed evidence only as of September 2, 2016 and never examined the claimant. (R. 189, 198). He did not explain which or how "psychiatric signs and [symptoms]" would require the claimant to miss one or two days of work per month. (R. 194-96). And he based his opinion that the claimant would require absences mostly on the claimant's subjective statements rather than the opinions of examining sources. (R. 190). So, according to the regulations, the ALJ properly assigned partial weight to Dr. Williams's opinion and substantial evidence supports the ALJ's decision to do so.

Also, substantial evidence supports the ALJ's explanation for why he assigned partial weight to Dr. Williams's opinion. Several records show that, as the ALJ stated, the claimant's mental condition was generally stable on medication and not severe enough to cause absences from work. (*See* R. 460-61, 471-72, 489-90, 495, 538). Several progress notes from VA visits show that the claimant's mental symptoms improved *after* Dr. Williams issued his opinion. (*See* R. 799, 862-67, 871-76, 891-92, 895-904). And, as the ALJ noted, no examining or treating

doctor reported that the claimant had work-related limitations.  (*See* R. 16).

So, as the law required him to do, the ALJ "state[d] with particularity the weight he gave [Dr. Williams's] opinion[] and the reasons therefor" and substantial evidence supports assigning only partial weight to that opinion and the ALJ's explanation for doing so.  *See Sharfarz*, 825 F.2d at 279.  Thus, the court will not reverse the ALJ's decision based on the weight assigned to Dr. Williams's opinion.

### 2. *Failing to Address the Claimant's Work History and Military Service*

Finally, in determining the claimant's RFC, the ALJ did not specifically address the claimant's work history or prior military service in the ALJ's decision.  According to the claimant, the ALJ committed reversible error by failing to do so because "the Agency's rules require [] consideration of a claimant's historical willingness to work in the credibility finding." (Doc. 13 at 25).  For the following reasons, the court disagrees.

First, though the ALJ had to *consider* evidence of the claimant's historical willingness to work, the ALJ did not have to specifically *refer* to that evidence in his decision.  *See* 20 C.F.R. § 404.1529(c)(3) (requiring the ALJ to "consider all of the evidence presented"); SSR 96-8p ("The RFC assessment must be based on all of the relevant evidence in the case record, such as . . . [e]vidence from attempts to work."); *Dyer*, 395 F.3d at 1211 ("[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision.").  So the court will not reverse the ALJ's decision merely because he did not specifically address the claimant's work history as the claimant urges the court to do.

Second, the claimant's argument misunderstands the standard of judicial review of the ALJ's decision.  The court will reverse the ALJ's decision only if he did not apply the correct legal standards or if substantial evidence does not support his factual conclusions.  *See* 42 U.S.C.

§ 405(g).  The court will *not* reverse the ALJ's decision merely because the claimant points to evidence that challenges the ALJ's conclusion.  *See Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) ("Even if the evidence preponderates against the Secretary's factual findings, we must affirm if the decision reached is supported by substantial evidence.").

Here, the claimant's historical willingness to work and military service does not undermine the substantial evidence that supports the ALJ's RFC determination.   As described above, evidence showed that the claimant went out in public on a regular basis; his psychological symptoms improved with medication; he had recently performed some manual labor; he had good strength in his extremities except for his fingers; he had diminishing shoulder pain; he had a normal gait; and he drove several times a week.  Dr. Williams's opinion, the majority of which the ALJ accepted, and the VE's opinion both supported the claimant's RFC.  The ALJ relied on all of these materials in finding the claimant's RFC.  So substantial evidence supports the ALJ's RFC determination.

Having rejected both of the claimant's arguments for why substantial evidence does not support the ALJ's RFC determination, the court will affirm the ALJ's decision.

## VII. CONCLUSION

For the reasons stated above, the ALJ applied the correct legal standards and substantial evidence supports his factual conclusions.  So, by separate order, the court will **AFFIRM** the ALJ's decision.

**DONE** and **ORDERED** this 23rd day of September, 2019.

**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE